WAKEM & McLAUGHLIN *v.* UNITED STATES (No. 1982).[1]

1. TEXTBOOK.

The term "textbook" applies only to such books as either set out in their text the facts or principles of some branch of learning which is to be taught to students, or to such as are prepared with especial introductions, notes, glossaries, spacings, or other "editorial apparatus," which particularly adapt them for the use of students or instructors engaged in classroom work as a class apart from more general readers.— Dutton & Co. *v.* United States (6 Ct. Cust. Appls., 460; T. D. 35987). The fact that a book is used in educational institutions does not make it a textbook within the meaning of that term in paragraph 426, tariff act of 1913.

2. EVERYMAN'S LIBRARY.

Volumes of a series planned to embrace 1,000 titles, being reprints of the world's classical literature in fiction, poetry, history, biography, economics, essays, children's books, etc., do not become textbooks because, on account of their compactness, cheapness, and convenient form, they are largely used by teachers and students as supplementary or illustrative reading or in classrooms. They are not admissible free of duty as textbooks, under paragraph 426, tariff act of 1913, but are dutiable as books not specially provided for under paragraph 329.—Dutton & Co. *v.* United States (6 Ct. Cust. Appls., 460; T. D. 35987).

United States Court of Customs Appeals, February 2, 1920.

APPEAL from Board of United States General Appraisers, Abstract 43135.

[Affirmed.]

*Sharretts, Coe & Hillis* for appellants.

*Bert Hanson*, Assistant Attorney General (*Martin T. Baldwin*, special attorney, of counsel), for the United States.

[Oral argument Dec. 19, 1919, by Mr. Sharretts and Mr. Baldwin.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

In the case of Dutton & Co. *v.* United States (6 Ct. Cust. Appls., 460; T. D. 35987), the question before us was whether some 150 titles of the well-known series of books called "Everyman's Library" were entitled to free entry as textbooks under paragraph 426 of the tariff act of 1913, hereinafter quoted.

---

[1] T. D. 38259 (38 Treas. Dec., 75).

Seven exhibits were submitted as representative of the 150 titles and the argument upon both sides assumed that these 150 titles in turn were fairly representative of the entire series.

The exhibits were—

Motley's Dutch Republic, three volumes.
Machiavelli's Prince, one volume.
The Federalist, one volume.
Shelley's Complete Poems, two volumes.
Marcus Aurelius, one volume.
Adam Bede, one volume.
Browning's Poems, two volumes.

It was held that the merchandise was not entitled to free entry.

T. D. 37781 (G. A. 8195) was another case involving the same question heard by the Board of General Appraisers. This covered 26 different titles of Everyman's Library, among which were 17 titles involved in the case now before us, hereinafter enumerated, and in addition—

The Motion of the Heart and Blood, by William Harvey.
Experimental Researches in Electricity, by Michael Faraday.
The Pilgrim Fathers, by John Masefield.
Conquest of Mexico, by William H. Prescott.
The History of Rome, by Theodor Mommsen.
Utilitarianism, Liberty, Representative Government, by John Stuart Mill.
Plato's Dialogues, two volumes.
A Discourse on Method, by René Descartes.
History of Rome, by Charles Merivale.

The board held that all the books were essentially of the same class as the ones before this court in the Dutton case and overruled the protest.

The case now before us involves some 10,900 volumes, all cloth bound, of Everyman's Library, imported at different times. They were held dutiable by the collector under paragraph 329, which so far as material is as follows:

329. Books of all kinds, bound or unbound, * * * not specially provided for in this section, 15 per centum ad valorem.

Some nine protests were filed, claiming free entry under paragraph 426, which extends that favor to—

Books and pamphlets printed wholly or chiefly in languages other than English; also books and music, in raised print, used exclusively by the blind, and all text-books used in schools and other educational institutions; * * *.

The protests were overruled by the Board of General Appraisers, and the case comes here on the importers' appeal.

The brief of importers' counsel classifies these books under various headings, indicative of the study or subject in the teaching of which it is claimed the respective books are textbooks, and we arrange these titles substantially as set forth in the brief.

*Philosophy and Ethics.. . .*

Plato's Republic. .
Nicomachean Ethics of Aristotle.
Theory of Vision. Principles of Human Knowledge, by Berkeley.
Emile, or Education.
St. Augustine's Confessions.

*English Literature, History thereof, and—*

Minor Elizabethan Drama.
Bede's Ecclesiastical History.
Age of Fable, by Thomas Bullfinch.
Macaulay's Critical and Historical Essays.
Century of Essays.
Select Plays of Beaumont and Fletcher.
Everyman, and Other Moralities and Miracle Plays,
Lincoln's Speeches and Letters.

*Political Economy.*

Ricardo's Principles of Political Economy.

*Economics and Finance.*

Smith's Wealth of Nations.

*History.*

Decline and Fall of the Roman Empire, by Gibbon.
Froissart's Chronicles.

Counsel argue that some of the books are entitled to be regarded as textbooks on more than one of the above subjects. To illustrate, Froissart's Chronicles is claimed to be a textbook on the subject of English literature as well as history. Some of the above five subjects were subdivided in the brief, but as arranged above sufficiently present importers' contention. It is stipulated among other things that the books before us are identical in every respect with those bearing the same titles in T. D. 37781 and that the record taken therein shall be admitted in evidence and made part of the record in this case. We understand that pursuant thereto the only testimony considered below consisted of that which was offered in T. D. 37781.

One result of importing into the record here the evidence taken in T. D. 37781 is that there is before us considerable testimony which does not relate to any books involved in this case. It aids nevertheless in disclosing the very wide and comprehensive scope of importers' theory as to what are textbooks.

Counsel for importers say they do not ask the court to modify or reverse any of the reasoning or findings in the Dutton decision but rather to apply the principles established there to the books of these importations in the light of the present record and claim that each of these books is a textbook within the rule of that case and that each book presents a separate and distinct issue. As we view the case, however, it is unnecessary to discuss each volume separately.

The record here, as in the Dutton case, is voluminous. The importers' witnesses include Mr. Macrae, the vice president and manager of Dutton & Co., and distinguished professors and instructors from leading educational institutions, including Harvard, Yale, Wellesley, and Vassar. The Government called competent witnesses upon the question of commercial designation, but, as in the earlier case, we do not think such evidence establishes a commercial understanding of the word "textbooks" that differs from the common meaning thereof.

The real question here is whether or not these books are textbooks. If not, they were properly classified by the collector and the judgment below should be affirmed.

In the Dutton case, while the exhibits were bound in cloth, it appeared that the entire series included three other styles of binding, namely, leather, quarter pigskin, and fortified library. Here it is limited to cloth-bound books. The Dutton case in a sense involved the whole of Everyman's Library, but the specific books here were not, however, especially considered there and the arguments proceed upon the theory that the status of the books here claimed to be entitled to free entry was not precisely adjudicated there.

It was said in substance in the opinion in the Dutton case that Everyman's Library was intended to include when completed all the world's classics in literature; that it had been begun eight years before; that it contained some seven hundred titles and was expected to embrace a thousand when completed. The following prospectus issued by the publishers was quoted in the opinion:

*The aim and scope of the series.*—"The true university in these days," said Carlyle, "is a collection of books." The main idea of this new series is to make it easy for everyone to obtain such a collection and get at small cost all that is good, all that has worn well in English literature. It will not offer only the classic authors, it will reprint the Victorians with the Elizabethans, comparatively new authors with the old famous ones, and books for pure pleasure as well as for wisdom and knowledge. Arranged in sections, as for history, philosophy, belles lettres, etc., it will make clear the relations of one kind of book to another, show the debt of romance like Ivanhoe or a romantic historian like Froissart, or set the poets side by side with a book of creative criticism like Coleridge's Biographia Literaria. Thus for a small amount the reader may have a whole bookshelf of the immortals.

In concluding that the importations there were not entitled to free entry, Martin, Judge, for the court said of the word "textbook":

The term * * * applies only to such books as either set out in their text the facts or principles of some branch of learning which is to be taught to students, or to such as are prepared with especial introductions, notes, glossaries, spacings, or other "editorial apparatus," which particularly adapt them for the use of students or instructors engaged in classroom work as a class apart from mere general readers.

It was also pointed out that the use in classroom of the books there considered seemed limited to classes in literature; that some were placed before such classes as standards or models to be the subject

of study; that they were subject to change according to the desire of the respective instructors; and that if the books there were held to be within the meaning of the term "textbooks," it would result in including all editions of all standard English books which because of binding and price might at times be chosen by instructors for the use of their students.

We still entertain the same views and proceed to consider whether respecting the particular volumes before us the importers have shown that they are textbooks within the rule of that case.

Examination shows that each volume has been given a particular number which identifies it as one of the series in "Everyman's Library" and identical volumes bound in leather and other bindings are also imported to which further reference will later be made.

Upon one of the preliminary or title pages there appears the following, taking Plato's Republic as typical:

---

This is No. 64 of Everyman's Library. The Publishers will be pleased to send freely to all applicants a list of the published and projected volumes, arranged under the following sections:

Travel　　Science　　Fiction
Theology and Philosophy

6.

History　　Classical
For Young People
Essays and Oratory
Poetry and Drama
Biography
Reference
Romance.

In Four Styles of Binding: Cloth Flat Back, Colored Top; Leather Round Corners, Gilt Top; Library Binding in Cloth, and Quarter Pigskin.

---

The most of the exhibits contain an introduction or a preface, some both, a bibliography and a table of contents. In several there are footnotes, some quite exhaustive, others not, and an index or a glossary, sometimes called notes, and in a few, an appendix. With

three exceptions, which are wrapped with blank paper, each book is inclosed in a paper cover, not fastened, upon which appears advertising matter designed to promote the sale of Everyman's Library, including favorable "notes from the press" and what purports to be a full list of all the books of the series. The books are of small and handy size, about 4½ by 7 inches, containing pages varying in number from three hundred to five hundred. In respect of the above characteristics, it is assumed they are substantially identical with all the others in Everyman's Library.

We are unable to discover anything in these books which seems designed or calculated to impress thereon the character of a textbook as distinguished from one designed for or used by the public generally or to find therein anything which clearly indicates that any particular book is in a class set apart for students' use. As arranged they are adapted to the use of the general reader and to a place in a general library in keeping with the original design of the producers as set forth in the Dutton case. To produce a textbook apparently was not the aim, and if it was within the scope of the plan of Everyman's Library, it was probably incidental. The sale of a great series such as Everyman's Library we do not think would be promoted if individual books were avowedly textbooks. The general public would not be expected to desire textbooks for the library and that is probably the reason why there is nothing in any of the volumes before us that unequivocally indicates that the book is designed to be used by students or teachers in educational institutions.

In this case the importer has produced evidence not in the Dutton case which tends to show that of the 17 titles here involved more of the cloth-bound copies are sold to schools and colleges and bookstores whose main business is the sale of books to such institutions and their pupils than to bookstores that supply the general public; that of the same books in other styles of binding more are sold to the general public; and that as to some of the books in all bindings more probably go to educational institutions and their students than to the general public, while as to others the contrary is true.

As in the Dutton case professors and instructors have testified to the use of these books in their institutions; that all, excepting Froissart's Chronicles, concerning which none seems to have been inquired of, were used more or less in classes and that, as they defined the term, all were textbooks. As a rule, in their opinion a textbook is one in which lessons are assigned or the text of which is discussed in classes. From their testimony it appears that in some of the institutions a given book is used as a textbook while in others it is used only as a book of reference, if used at all, and that a book that is used at some period as a textbook may not in another be so used—that is, the use changes. Substantially all are agreed that one reason which led them

to class as a textbook such as those concerning which they were inquired of, was its low cost. They also testified that the books to which their evidence was especially directed (and the attention of some witnesses of this class, but not all, was called to every book except Froissart's Chronicles) contain in their texts facts or principles of some branch of learning which was to be taught to students. This was mentioned in the Dutton case as a characteristic of textbooks. The fair import of their testimony is that, defining the work "textbook" as they did, almost any good book of literature might become a textbook in the teaching of that subject, and so as to the other subjects upon which instruction in their institutions was given. Some of these witnesses testified that books are divided into three classes, illustrating those as to history as, first, pedagogical books; second, books especially for classroom use as shown by their notes and entire make-up; and third, books of history at large. They also recognized the fact that there is in existence a class of books known as textbooks written about the various subjects of study and specifically designed for use in the classroom, one witness saying with reference to textbooks of English literature that he did not use such textbooks but used the literature itself, while another in testifying that a textbook is one which must be used in class for the sake of its text, said that nevertheless he did not use Bede's Ecclesiastical History or the Confessions of St. Augustine in that manner, but rather for reference, concluding that they were not in his experience textbooks, yet for some one else they might be.

Now the tariff law contemplates that all books, generally speaking, unless printed in other than the English language, shall be dutiable. Paragraph 427 provides, however, that under regulations to be prescribed by the Secretary of the Treasury, any college, academy, school, or seminary of learning may, by its order, procure free of duty not more than two copies of a book in any one invoice, if not designed for sale, and the frequency with which such importation may be made is not indicated.

If Congress had designed to give free entry to all books used in educational institutions, whether in or out of classes, instead of to all "textbooks," it could easily have employed language appropriate to produce that result. The use of the word "textbook" in paragraph 426 evidently was deliberate, and in connection with the other provisions of the statute indicates that Congress had in mind there was a class of books commonly known as textbooks designed for and adapted to the use of students as apart from those adapted to and designed for the use of the general reader.

While no doubt the instructors have undertaken to fairly give their views as to the meaning and application of the term "textbook,"

it is at the best only an aid to this court, as the statute must be construed in the meaning commonly given to the words employed. To sustain the importers' contention here would result in this: If the cloth-bound copies be held to be textbooks, either the copies in other bindings must be likewise so classified or the anomalous result follows that the classification depends upon the binding. If this be not so, and a particular book in all bindings be held a textbook, the general public would receive the benefit of free entry as textbooks for volumes that were not desired, acquired, or used for such purposes. We can not think that Congress intended such results. Especially is that true when we learn from the importers' witnesses, as well as those produced by the Government, what almost everyone knows, viz, that there is a class of books primarily and especially adapted and designed as textbooks for students' use.

While this question may not be entirely free from doubt, yet such doubts as present themselves to us, if resolved in favor of the importers, would hardly warrant sustaining the protests here. The opinion of the Board of General Appraisers in T. D. 37781, supra, so aptly expresses our views that we quote the same:

> There are on the market textbooks on history, science, literature, and other branches of learning, but the books in question bear no outward or visible sign or internal evidence of being included within that category. To meet the tariff provision here invoked by the importers necessarily requires more proof than that a book is largely or even chiefly used as a textbook in schools and other educational institutions. The book itself must be a textbook, and we can not conceive how that fact can be determined unless the book bears some internal evidence which will tend to distinguish it from the ordinary library book. To attempt to hold as textbooks all books with which students in higher institutions of learning are obliged to become conversant nowadays, would mean that practically every standard work of literature, science, art, drama, etc., is a textbook, for they all contain certain facts and principles governing their respective subjects which at some time or other form the subject of lectures and discourses in colleges and universities.

We think the judgment of the Board of General Appraisers ought to be and it therefore is *affirmed.*